2020 IL App (1st) 171883-U

No. 1-17-1883

Order filed March 26, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 12 CR 17092 |
| | ) | |
| LAWRENCE WILFORD, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Justice Lampkin concurred in the judgment.
Presiding Justice Gordon dissented.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's summary dismissal of defendant's postconviction petition where it is not arguable that his trial counsel provided ineffective assistance and not arguable that the State committed a discovery violation.

¶ 2    Defendant Lawrence Wilford appeals from an order of the circuit court summarily dismissing his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). On appeal, defendant contends that his petition set forth arguable claims that:

(1) his trial counsel was ineffective for failing to call his partner as a witness during trial; (2) his trial counsel was ineffective for failing to investigate and present evidence of the prior misconduct of the police officers involved in his case; and (3) the State committed a discovery violation by failing to disclose the evidence of the prior misconduct of those officers. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     Chicago police searched a house located on the 300 block of North Homan Avenue pursuant to a search warrant that identified the residence and a man named Antonio Jenkins. During the search of a second-floor bedroom, the police observed defendant and Shawanna Clark asleep. In that bedroom, the police found approximately 34 grams of heroin, bullets of different calibers and items often used to package drugs. As a result, a grand jury indicted defendant with one count of possession of a controlled substance with intent to deliver and two counts of unlawful possession of a weapon by a felon. His case eventually proceeded to a jury trial.

¶ 5                                   A. Trial

¶ 6     The following recitation from trial comes directly from the Rule 23 order that disposed of defendant's direct appeal. See *People v. Wilford*, 2016 IL App (1st) 141610-U.

> "At trial, Chicago Police Officer Paul Parks testified that on August 18,
> 2012, he and several other officers executed a search warrant at a two-story, single-
> family residence located [on the 300 block of] North Homan Avenue in Chicago.
> When he arrived at the residence, officers attempted to 'contact the people inside'
> but were unsuccessful. As a result, they forcibly entered the residence. Upon
> entering, the officers' first priority was to 'clear' the residence to account for all of
> its occupants and any possible weapons. Parks observed two individuals on the first

floor, including Jenkins, and they were subsequently detained. Parks continued to the second floor where, immediately beyond a doorway, he observed a bedroom with a dresser, crib and defendant and a female asleep in a bed.

Defendant and the female woke up and were startled by the officers' presence. They were detained while the officers 'clear[ed]' the rest of the second floor. The officers found no one else upstairs. Afterward, Parks informed defendant and the female that he had a warrant authorizing the search of the residence. Defendant responded, stating he had 'some blows on the dresser,' which Parks explained is a street term for heroin. Parks proceeded to open one of the dresser drawers and observed money and multiple bags containing suspect narcotics. Parks gave defendant his *Miranda* warnings and asked him if he had any weapons upstairs. Defendant responded that he did not have a firearm anymore, but 'had some bullets in his dresser.' Defendant and the female were transported downstairs, so the police could finish the search of the residence.

Parks continued to search the dresser in the second-floor bedroom, and he found more plastic bags containing suspect narcotics and empty 'little ziplock baggies,' which he explained are often used to package narcotics. In the dresser, he also found 10 .38-caliber rounds and a .22-caliber round inside a black sock. On the floor underneath the bed, Parks found multiple plastic baggies, a plate, a spoon, a playing card, all of which contained narcotics residue, a scale and a box. The scale, which Parks believed was for weighing the narcotics based on his experience, also had residue of suspect heroin. Inside the box, Parks observed more suspect heroin, more empty plastic bags and a bottle labeled 'Dormin,' which he explained

is a 'filler' used to 'cut the narcotics' and to make the narcotics 'more profitable.' Some of the bags Parks observed were tinted black and contained gold skull imprints, which he explained is a 'signature' identifying an area where the narcotics are sold. On top of the dresser, Parks recovered a photograph of defendant and the female, and a bill addressed to defendant at [the North Homan] address from Assurity Life Insurance Company with the postage date stamped August 8, 2012.

Parks acknowledged he had never seen defendant at the residence prior to that day. He did not check if defendant's name was on the mailbox, the doorbell, any utility bills or a deed to the residence, and agreed defendant's name was not on the search warrant. Parks looked up the residence on the Cook County Assessor's Office website, but defendant's name did not appear on the record. He later explained that he searched the residence on the Assessor's website only to see what the residence looked like and no information about the property's owners appeared on the record. Parks did not request DNA or fingerprint testing on any of the evidence recovered from the second-floor bedroom, but explained he had never requested either test on a narcotics case. He searched defendant, but did not recover anything from his person, including keys. Parks also did not find an identification card from defendant. Parks testified he took notes when talking to defendant to record any statements, but stated the notes 'may have been disposed of.' He, however, copied the statement into his case report, which he stated was a summary of the events that occurred.

After Parks testified, defendant moved to dismiss the case because of a discovery violation based on Parks' testimony that he may have disposed of his

original notes which contained defendant's statements. Alternatively, defendant requested the court give the jury an instruction to disregard the statements and the State be barred from further testimony about them. The court denied defendant's requested relief.

Officer Karen Rittorno testified to being the evidence collection officer during the execution of the search warrant, which occurred at 7:30 a.m. She went to the bedroom on the second floor after being informed that evidence had been found there. In a dresser drawer, Rittorno recovered a black bag which contained a brown bag with 'a black chunky substance,' which was suspect heroin, multiple bags containing suspect heroin, $851, a bag with suspect cannabis and a bag with suspect crack cocaine. Underneath the bed, she recovered a spoon, a playing card, a scale with suspect heroin residue and multiple plastic bags containing suspect heroin. Rittorno did not find keys or checks belonging to defendant, and did not know who owned the property, who leased the property or whose names were on the utilities. She did not inventory any male clothing in the case.

Kristine Benak, a forensic scientist with the Illinois State Police, testified she received and tested the evidence from this case. The contents of the relevant items tested weighed approximately 34 grams and tested positive for heroin.

At the conclusion of the State's case, the parties stipulated that defendant had previously been convicted of a felony in case No. 93 CR 12516 as the predicate offense for the two counts of unlawful use or possession of a weapon by a felon. Defendant moved for a directed [verdict] on all three counts, but the court denied the motion.

Defendant testified that he was a manager with H&M Transportation, overseeing more than 20 employees. He had worked there for 10 years before starting his own business for 18 months. He subsequently returned to H&M Transportation and had been working there for 2 years until this case. Prior to June 30, 2012, defendant lived in an apartment [on the 1100 block of] South Richmond. However, on that date, he moved to [the 700 block of] North Trumbull, a single-family residence in Chicago and had been living there ever since. He purchased the property with his fiancée Shawanna Clark, whom he had been engaged to for two years. They had two children together and had known each other since 1997. Although defendant acknowledged only Clark's name appears on the title to the property, he explained this was because his credit was poor but maintained he helped fund the down payment to the property. The utilities to the residence were also in Clark's name, although he helped pay them. Clark, however, was not living with him on the date of the offense. Instead, she was living [on the 300 block of] North Homan, her grandmother's house, who had passed away in February 2012. Although Clark had bought the property [on the 700 block of] North Trumbull with defendant, she was 'having issues with moving' because she had lived at [the North Homan residence] her entire life. Defendant and Clark's children lived with Clark at [the North Homan residence], and defendant acknowledged the crib pictured in one of the State's exhibits was for one of their children. Defendant considered himself an involved and active parent.

On August 17, 2012, defendant arrived at [the North Homan residence] around 9:30 p.m. with Chinese food and 'to settle an argument' with Clark, which

involved her moving into the property [on the 700 block of] North Trumbull. He had not been to [the North Homan residence] in three weeks. He went upstairs to Clark's bedroom, and they ate the food. Although defendant had not planned to stay the night, he fell asleep in the bedroom around 2 a.m., wearing a white t-shirt, blue jean shorts and gym shoes. He fell asleep with his wallet in his back pocket and keys in his front pocket. His driver's license, which was in his wallet that night and depicted in a defense exhibit, identified his address as [on the 1100 block of] South Richmond with an issue date of July 10, 2012. He wanted to change the address to [the North Trumbull residence], but he did not have mail at his new address yet. Defendant had six keys, three keys to [the North Trumbull residence], two keys to [the South Richmond residence] and one car key. He did not have keys for [the North Homan residence]. Defendant explained he still had keys to [the South Richmond residence] because the owner had died, and when he moved out, he 'just kept the keys' and 'never gave them back.'

Defendant woke up the following morning to Officer Parks in the bedroom telling him to '[f]reeze' and 'put [his] hands up.' Parks patted defendant down and searched him, finding both his wallet, which Parks opened, and keys. He took both items from defendant. Parks asked defendant if anyone else was upstairs, and defendant replied that he did not know. Parks detained him and Clark, and they both were led downstairs. Defendant denied telling Parks that there were some 'blows either on or in the dresser,' ammunition in the bedroom or that he did not have a firearm anymore. Defendant denied ever owning, leasing, paying utilities, keeping clothes or personal belongings, or regularly visiting [the North Homan

residence]. He never went in the dresser drawers or underneath the bed, and he specifically denied that anything in the dresser drawers or underneath the bed belonged to him. Defendant stated that all his personal belongings, including important documents and clothes, were at [the North Trumbull residence]. Defendant maintained he did not possess heroin on either August 17 or 18, 2012, did not have heroin or drug paraphernalia at [the North Homan residence] and that none of the items testified to by police officers at his trial were his.

Defendant stated the life insurance bill was a policy paid by Clark since 2004 covering defendant. The policy was Clark's idea because a cousin of hers and a friend had died without having life insurance. Since Clark paid the policy, the bill was sent to her address. Clark had also purchased life insurance for herself, her father and her two children. Defendant explained the photograph of him and Clark recovered by the police belonged to Clark. Although defendant agreed that in a photograph of the second-floor bedroom, men's shoes could be seen, he denied the shoes were his and did not know to whom the shoes belonged. Defendant stated Clark's brothers frequented the house often.

After defendant's business began performing poorly, he attempted to obtain public aid. He presented three letters from the Illinois Department of Human Services addressed to him at [the North Trumbull residence] and dated August 21, 24 and 29, 2012, respectively. He also presented a bill from ComEd addressed to him at [the South Richmond residence] and dated April 27, 2012. Lastly, defendant presented a HUD-1 Settlement Statement for the property located at [the North

Trumbull residence], which named Clark as the borrower, and was dated June 28, 2012." *Id.* ¶¶ 4-17.

¶ 7 The jury ultimately found defendant guilty of possession of a controlled substance with intent to deliver, but not guilty on both counts of unlawful possession of a weapon by a felon. The trial court subsequently sentenced him to eight years' imprisonment, and he appealed.

¶ 8                      B. Direct Appeal

¶ 9 On direct appeal, defendant contended that the State failed to present sufficient evidence that he was guilty of possession of a controlled substance with intent to deliver and that his mittimus had to be corrected to reflect the actual crime for which he was convicted. *Id.* ¶¶ 19, 28. Although this court ordered his mittimus to be corrected, we found sufficient evidence to convict him of possession of a controlled substance with intent to deliver and accordingly affirmed his conviction. *Id.* ¶¶ 23, 29-30. Thereafter, defendant unsuccessfully filed a petition for leave to appeal to our supreme court.

¶ 10                C. Postconviction Proceedings

¶ 11             1. Failure to Call Shawanna Clark as a Witness

¶ 12 On March 22, 2017, defendant filed a *pro se* postconviction petition, contending that his constitutional rights had been violated in multiple manners. First, the petition argued that defendant's trial counsel had been ineffective for failing to call Shawanna Clark as a witness at his trial. The petition claimed that Clark told counsel that defendant never made a statement to the officers that he had drugs in the dresser, and defendant told counsel he was "framed" by Officer William Hronopoulos who had "planted the drugs" at the scene.[1] According to the petition, this

---

[1] Officer Hronopoulos was one of the officers who executed the search warrant, but he did not testify at defendant's trial.

evidence was necessary because the case came down to a credibility contest between him and Officers Park and Rittorno. Additionally, the petition alleged that Clark told counsel that defendant was merely an overnight guest at the house, he never actually resided there, and she paid for the insurance policy that was found in the second-floor bedroom listing defendant's name and the North Homan residence. The petition asserted that Clark was willing to testify and listed on defendant's answer to discovery, and counsel's failure to call her as witness deprived him of effective assistance of counsel.

¶ 13     In support of this claim, defendant attached his own affidavit, in which he made averments consistent with the petition's allegations, and described Clark as his "girlfriend." Defendant also attached an affidavit from Clark, in which she made averments consistent with the petition's allegations. Additionally, defendant attached a transcript from the day his trial began, wherein the State and his trial counsel discussed which witnesses would be read to the prospective jurors during the jury selection process. Counsel informed the court that he wanted Clark's name included.

¶ 14                         2. Failure to Investigate Officers' Prior Misconduct

¶ 15     The petition next contended that defendant's trial counsel had been ineffective for failing to investigate and present evidence of the prior misconduct of the officers involved in his case. Defendant attached to the petition multiple documents purportedly showing such prior misconduct. One document was a printout from the Chicago Reporter's website that contained the case number 09-CV-1726. The website claimed there had been a $150,000 settlement for "false arrest" against "Officer Paul Park" and another officer for an incident in March 2008, where a group of officers falsely arrested and physically assaulted two men during a domestic battery call. The only allegation specific to Officer "Park" in the printout was that he "verbally abused" several residents of the home. Defendant attached a second printout from the Chicago Reporter's website that

contained the case number 12-CV-7835. The website claimed there had been a $75,000 settlement for "illegal search/seizure" against Officers Paul Parks, Officer Rittorno as well as 11 other officers for incidents spanning between September 2010 and August 2013, where the officers broke into a residence four times, conducted searches without valid warrants and harassed the residents. Defendant also attached a docket entry from a federal civil rights lawsuit titled *Beck et al. v. The City of Chicago et al.* (case number 14-cv-546) that named Officers Parks, Rittorno and Hronopoulos as three of several defendants. The docket entry did not contain any specifics of the lawsuit's allegations, only that it was filed in January 2014 and terminated in January 2016. Lastly, defendant attached a printout from a website with the address "cpdb.co", which showed that a complaint had been filed against Officers Parks and Rittorno as well as eight other officers for an alleged false arrest in April 2013. The printout stated that the "final outcome" of the complaint was "no action taken." The printout also showed that, over their careers, Parks had one complaint lobbied against him but zero "disciplines" while Rittorno had 15 complaints lobbied against her and one "disciplines." Defendant's petition argued that, had counsel investigated the prior misconduct of the officers and presented such evidence during trial to impeach them, there was a "high probability" the result of his trial would have been different.

¶ 16                                    3. Discovery Violation by the State

¶ 17     The petition further contended that the State committed a discovery violation and prosecutorial misconduct by not providing the defense the records of the prior misconduct of the officers. The petition alleged that the assistant state's attorney assigned to defendant's case "was aware that [Officers Parks and Rittorno] engaged in unprofessional misconduct over the years and cost the City of Chicago a substantial amount in legal fees and civil damages for falsely arresting people, filing false reports and other unknown offenses." Yet, according to the petition, the

assistant state's attorney failed to disclose this evidence to the defense and "purposely engaged in prosecutorial misconduct by intentional [*sic*] suppressing [their] disciplinary records for the sole purpose to prevent the defendant from using the damaging documents for impeachment."

¶ 18    In support of this contention, defendant relied on the same documents purportedly showing the prior misconduct of the officers. Defendant also attached a transcript from before trial, where the parties' discussed various motions *in limine*. During the discussion of the State's motion *in limine* related to precluding defendant from "mentioning, referencing, or arguing police or prosecutorial misconduct not supported by the facts" of the case, trial counsel indicated he did not anticipate the need for any such mentions. After a question by the trial court, the State specified that its motion was in reference to "asking officers about other cases where they have been suspended or anything unrelated to this case." The court asked the State if there was "anything like that," and the State replied, "[n]ot to the State's knowledge." The court accordingly granted the State's motion. In defendant's petition, he claimed the State's response "was blatantly false," as evidenced by the misconduct records he attached.

¶ 19                                4. Circuit Court Ruling

¶ 20    On June 15, 2017, the circuit court entered a written order on defendant's postconviction petition. Initially, the court found all of the issues in the petition waived, but went on to discuss the merits of each contention. The court ultimately found the issues raised in the petition were frivolous and patently without merit, and therefore summarily dismissed the petition.

¶ 21    Defendant subsequently appealed.

¶ 22                                II. ANALYSIS

¶ 23                          A. Postconviction Proceedings

¶ 24    The Act provides a three-stage process for defendants who allege that they have suffered a substantial deprivation of their constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26. This appeal only concerns the first stage, as that is where the circuit court dismissed defendant's petition. At the first stage of proceedings under the Act, after the defendant files a petition, the circuit court must determine whether the petition states the gist of a constitutional claim, or is frivolous or patently without merit. *People v. Bailey*, 2017 IL 121450, ¶ 18; see also 725 ILCS 5/122-2.1(a)(2) (West 2016). At this stage, the court acts " 'strictly in an administrative capacity by screening out those petitions which are without legal substance or are obviously without merit.' " *People v. Tate*, 2012 IL 112214, ¶ 9 (quoting *People v. Rivera*, 198 Ill. 2d 364, 373 (2001)). A petition may be deemed frivolous or patently without merit only where it has no arguable basis in either law or fact (*id.*), meaning the petition relies "on 'an indisputably meritless legal theory or a fanciful factual allegation.' " *People v. Boykins*, 2017 IL 121365, ¶ 9 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009)). At the first stage, the petition's allegations of fact are accepted as true as long as they are not affirmatively rebutted by the record. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 47. And we must keep in mind that petitions should be construed liberally, meaning "borderline" petitions should be allowed to proceed. *Id.* ¶ 48. We review the circuit court's first-stage dismissal *de novo*. *Boykins*, 2017 IL 121365, ¶ 9.

¶ 25                                    B. Forfeiture

¶ 26    At the outset, we note that, in the circuit court's written order, it stated the general principles of postconviction law that issues that could have been raised on direct appeal, but were not, are forfeited (see *People v. English*, 2013 IL 112890, ¶ 22), though the court used the term "waived," and that forfeiture of postconviction claims are a proper basis for first-stage dismissal. *People v. Blair*, 215 Ill. 2d 427, 445 (2005). The court then proceeded to find without further

analysis that all of the contentions in defendant's postconviction petition were "procedurally barred by the doctrine of waiver," although the court ultimately addressed the merits of each contention. On appeal, the State does not argue that defendant forfeited any of the contentions in his petition for failing to raise them on direct appeal, a tacit admission that none of the contentions were forfeited. Because we agree, we will address the merits of the petition's contentions.

¶ 27                                C. Ineffective Assistance of Counsel

¶ 28    Defendant first contends that his postconviction petition set forth multiple arguable claims that his trial counsel was ineffective. To establish that trial counsel was ineffective, the defendant must satisfy the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Domagala*, 2013 IL 113688, ¶ 36. Under this standard, he must show that his counsel's performance was deficient and the deficiency prejudiced him. *Id.* Specific to the first stage of the Act, "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced" (*Hodges*, 234 Ill. 2d at 17), *i.e.*, it is arguable that the result of the proceeding would have been different but for counsel's performance. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 79. Both elements of the Strickland test must be met, and we may analyze them in any order. *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 109.

¶ 29                                1. Failure to Call Shawanna Clark as a Witness

¶ 30    Defendant first argues that his postconviction petition presented an arguable claim that his trial counsel was ineffective for failing to call Clark as a witness at his trial. Defendant asserts that Clark was the only witness who could have corroborated his trial testimony that he did not make any incriminating statements to the officers and that he did not reside at the residence, but merely had stayed there overnight.

¶ 31    Generally, the decisions about which witnesses to call at trial and what evidence to present are strategic ones. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Because these decisions are matters of trial strategy, they "are generally immune from claims of ineffective assistance of counsel." *Wilborn*, 2011 IL App (1st) 092802, ¶ 79. However, the defendant can rebut this strong presumption that the challenged action was sound trial strategy if counsel's decision was "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 32    In this case, it is not arguable that defendant's trial counsel fell below an objective standard of reasonableness by not calling Clark as a witness. First, it is clear that trial counsel was aware of what Clark would have testified to at trial and that she was present in the second-floor bedroom when the police executed the search warrant. During pretrial argument on the State's motion *in limine* to bar the defense from referencing "any hearsay statements made by the defendant," the State remarked that the motion related to "Miss Clark testifying to statements the defendant made to bolster, you know, I don't live, you know, or that's not my stuff." In response, the court asked if Clark was in the bedroom with defendant. Trial counsel replied that the court was correct and stated "if she heard that, I think she would be allowed to bring that up." Based on the record, counsel undoubtedly knew what Clark could provide as a witness.

¶ 33    Despite trial counsel knowing the content of Clark's potential testimony and the fact that it could have supported defendant's own trial testimony, there were legitimate reasons for counsel

not to call her as a witness. For one, she was in a relationship with defendant. At trial, defendant testified that Clark was his fiancée while in his postconviction petition, he described Clark as his girlfriend. Regardless of the precise description of their relationship, they were clearly in one, and counsel could have decided that she would be viewed by the jury as too biased a witness to have any credibility. See *People v. Barcik*, 365 Ill. App. 3d 183, 192 (2006) (trial counsel not ineffective for failing to call the defendant's fiancée as a witness during trial where "because of her relationship to defendant, [she] likely would not have been considered a credible witness"). Counsel also could have concluded that the value of her direct examination could be outweighed by any cross-examination. See *People v. Kubat*, 114 Ill. 2d 424, 433 (1986) (trial counsel not ineffective for failing to call two witnesses at trial where counsel could have reasonably concluded "that cross-examination could severely damage their credibility"); *People v. Lewis*, 105 Ill. 2d 226, 248 (1984) (trial counsel not ineffective for failing to call certain witnesses at trial where counsel's decision "not to call these people as witnesses could have been an example of wise defense tactics" because "[i]mpeachable evidence can be more harmful than an absence of evidence"). Given these legitimate potential reasons not to call Clark as a witness, counsel's decision was not so irrational or unreasonable that no reasonably effective attorney, under similar circumstances, would have made the same decision. See *Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 34    Nevertheless, defendant posits that the jury had difficulty accepting the State's version of events, noting that the jury deliberated for several hours, asked three questions of the trial court and had to be given a *Prim* instruction by the court. However, when evaluating a trial counsel's conduct, "[e]very effort must 'be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' " *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 23 (quoting

*Strickland*, 466 U.S. at 689). Given the aforementioned sound strategic reasons why counsel may have chosen not to call Clark as a witness, at the time counsel had to make the decision, it was reasonable under the circumstances.

¶ 35    We further observe that trial counsel conducted a vigorous cross-examination of the State's witnesses, in particular Officer Parks, and doggedly attempted to show that defendant had a tenuous connection to the North Homan residence. Counsel also attempted to dispel doubt about defendant's incriminating statement about the location of the drugs by eliciting from Officer Parks that he may have destroyed the notes he took that recorded defendant's statement. Where counsel had multiple legitimate strategic reasons not to call Clark as a witness and conducted a meaningful adversarial testing of the State's case overall, it is not arguable that counsel's performance fell below an objective standard of reasonableness. Consequently, the circuit court properly disposed of the postconviction petition's claim that trial counsel was ineffective for failing to call Clark as a witness.

¶ 36                                2. Failure to Investigate Officers' Prior Misconduct

¶ 37    Defendant next argues that his postconviction petition presented an arguable claim that his trial counsel was ineffective for failing to investigate and present any prior misconduct of the officers involved in his case. Defendant posits that counsel could have obtained the records of the officers' prior misconduct through a simple Google search, a Freedom of Information Act request, or subpoena, and the records could have been used to impeach the credibility of Officer Parks. Although on appeal defendant focuses on impeachment of Officer Parks

¶ 38    As noted, generally, the decision about what evidence to present is a strategic one. *Wilborn*, 2011 IL App (1st) 092802, ¶ 79. But "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79

(2002). To this end, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. And "strategic decisions may be made only after there has been a 'thorough investigation of law and facts relevant to plausible options.' " *People v. Gibson*, 244 Ill. App. 3d 700, 703-04 (1993) (quoting *Strickland*, 466 U.S. at 690). Allegations of prior misconduct by a police officer may be admissible at trial "to prove intent, plan, motive, or a course of conduct of the officer [citations] or to impeach an officer as a witness based on bias, interest, or motive to testify falsely." *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 11. Whether trial counsel was ineffective for failing to investigate is generally determined by comparing the strength of the trial evidence with the value of the evidence allegedly not presented at trial. *People v. Clark*, 2011 IL App (2d) 100188, ¶ 24.

¶ 39    Initially, we note that there is no evidence that trial counsel failed to investigate the backgrounds of the officers. But assuming *arguendo* that counsel did unreasonably fail to do so, this failure did not prejudice defendant. The first two records were printouts from the Chicago Reporter's website. The first printout claimed that there had been a $150,000 settlement against "Officer Paul Park" and another officer for an incident in March 2008, where a group of officers falsely arrested and physically assaulted two men during a domestic battery call. Given that this printout named "Paul Park," not "Paul Parks," that alone leaves enough doubt that it is the same Chicago police officer, even if the names are remarkably similar. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice.").

¶ 40    Moving beyond the name issue, assuming that it was a misspelling and the printout concerned the same officer involved in this case, the only allegation specific to Officer Parks was that he "verbally abused" several residents of the home. While allegations of verbal abuse are

certainly serious matters, such allegations are completely unrelated to what defendant has alleged in this case, namely lying and attributing a statement to him that he did not make. See *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 17 (for evidence of prior misconduct by a police officer to be admissible as impeaching evidence, there must be a sufficient temporal proximity, "a repetition of similar misconduct, and the similarity of the past misconduct to the conduct at issue"). Given the dissimilarity between allegations of verbal abuse and lying, it is quite possible, if not likely, that the trial court would have barred defendant from using the first printout from the Chicago Reporter's website as impeaching evidence. Moreover, although the first printout indicated that Officers Parks was involved in a settlement, a settlement is not dispositive of liability or guilt. See *County of Cook v. Illinois Labor Relations Board*, 2012 IL App (1st) 111514, ¶ 32 ("[N]egotiations and settlements do not constitute an admission of guilt for any reason and are, therefore, irrelevant."). Given these issues with the first printout from the Chicago Reporter's website, if it was even admissible, it would not have materially helped defendant at trial.

¶ 41 The second printout claimed that there had been a $75,000 settlement against Officers Paul Parks, Officer Rittorno as well as 11 other officers for incidents spanning between September 2010 and August 2013, where the officers broke into a residence four times, conducted searches without valid warrants and harassed the residents. Although this printout asserted that Officers Parks and Rittorno were involved in the settlement, there are no allegations specific to either of them, leaving uncertainty as to their exact role in the alleged incidents. See *Bew*, 228 Ill. 2d at 135 ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice."). Because of this, it is quite possible that the trial court would have barred defendant from using the second printout from the Chicago Reporter's website as impeaching evidence. See *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 17. And just like the first printout, the second printout merely indicated that Officers

Parks and Rittorno were involved in a settlement, which is not dispositive of liability or guilt. See *County of Cook*, 2012 IL App (1st) 111514, ¶ 32. Given these issues with the second printout from the Chicago Reporter's website, if it was even admissible, it would not have materially helped defendant at trial.

¶ 42     Moving on to the docket entry from the federal civil rights lawsuit that named Officers Hronopoulos, Parks and Rittorno as three of several defendants. Because defendant only attached the docket entry, it is entirely unclear the content of the allegations in the lawsuit. Axiomatically, merely being sued in federal court is not evidence of wrongdoing, and for this reason, the trial court very likely would have barred defendant from using the printout at trial for impeachment purposes. See *People v. Coleman*, 206 Ill. 2d 261, 279 (2002) ("Mere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case is not admissible to impeach the officer."). Even if the docket entry were somehow admissible, because it does not demonstrate that Officers Hronopoulos, Parks and Rittorno did anything wrong, it would not have materially helped defendant's cause at trial.

¶ 43     Lastly, the printout from the "cpdb.co" website showed that a "complaint" had been filed against Officers "Paul Parks" and Rittorno as well as eight other officers for false arrest in April 2013. This printout has no specific allegations directed against Officer Parks or Rittorno, and notably, the printout even remarked that "no action taken" was the final outcome of the complaint against Officer Parks. "Mere allegations of misconduct, without evidence the officer was disciplined, are not admissible as impeachment." *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 20. Further, although the printout showed that Officer Rittorno had 15 complaints lobbied against her and one "discipline[]," there is no indication from the document about why she was disciplined. See *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 17 (for evidence of prior misconduct by a police

officer to be admissible as impeaching evidence, there must be a sufficient temporal proximity, "a repetition of similar misconduct, and the similarity of the past misconduct to the conduct at issue"). Thus, the printout would likely not even be admissible at trial for impeachment purposes. But even if this document were somehow admissible, because it contains no specific allegations, the document would not have materially helped defendant's cause at trial.

¶ 44    Given that all of these documents might not have even been admissible at trial and even if they were, they would have had little impeachment value, it is not arguable that the result of the proceeding would have been different had trial counsel investigated and presented the evidence of the officers' prior misconduct, regardless of the strength or weakness of the State's case. See *Clark*, 2011 IL App (2d) 100188, ¶ 24. Consequently, the circuit court properly disposed of the postconviction petition's claim that trial counsel was ineffective for failing to investigate.

¶ 45                              D. Discovery Violation by the State

¶ 46    Lastly, defendant contends that his postconviction petition presented an arguable claim that the State committed a discovery violation by failing to disclose the evidence of the officers' prior misconduct.

¶ 47    Under *Brady v. Maryland*, 373 U.S. 83 (1963), the State will have committed a discovery violation and violated a defendant's due process rights if it fails to disclose evidence that is favorable to the defendant and material to his guilt. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). To succeed on a *Brady* claim, the defendant must show that: (1) the undisclosed evidence favored him as either being exculpatory or useful for impeachment purposes; (2) the State either willfully or inadvertently suppressed the evidence; and (3) he was prejudiced because the evidence was material to his guilt. *Id.* at 73-74. "Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74.

¶ 48 Assuming *arguendo* that defendant satisfied the first and second elements of the *Brady* test, it is not arguable that the records of the officers' prior misconduct were material to his guilt. As just discussed, all of the documents might not have even been admissible at trial and if they were, they would have had little impeachment value. Because of this, it is not arguable that a reasonable probability exists that disclosure of the evidence would have resulted in a different outcome, and thus, not arguable that defendant was prejudiced by the State's alleged failure to turn over the documents to him. Consequently, the circuit court properly disposed of the postconviction petition's claim that the State committed a discovery violation.

¶ 49                                     III. CONCLUSION

¶ 50 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 51 Affirmed.

¶ 52 PRESIDING JUSTICE GORDON, dissenting:

¶ 53 For the following reasons, I must respectfully dissent from the majority's affirmance of the trial court's summary dismissal of defendant's *pro se* postconviction petition.

¶ 54 As the majority acknowledges, a court may summarily dismiss a *pro se* postconviction petition only if it is frivolous and patently without merit. *People v. Bailey*, 2017 IL 121450, ¶ 18; see also 725 ILCS 5/122-2.1(a)(2) (West 2016). A petition is deemed frivolous when it relies on " 'an indisuptably meritless legal theory or a fanciful factual allegation.' " *People v. Bokins*, 2017 IL 121365, ¶ 9 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009)). A fanciful factual allegation is one that is "fantastic or delusional." *Hodges*, 234 Ill. 2d at 17. Since *pro se* petitions are "viewed with a lenient eye," "borderline cases" should be allowed "to proceed." *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 48. I believe that this petition should be allowed to proceed.

¶ 55    Our standard of review is *de novo*, which means that we owe no deference to the trial court's decision, and we perform the same analysis that a trial judge would perform. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151. The majority found that defendant had not forfeited his claims (*supra* ¶ 26), and I agree.

¶ 56    On appeal, defendant claims that his trial counsel was ineffective for failing to call his girlfriend as a witness during trial and for failing to investigate prior misconduct of the arresting officers; and that the State provided false information about whether the officers in this case were subjects in prior misconduct cases.

¶ 57    In the case at bar, drugs, extensive narcotics-trafficking paraphernalia and ammunition were found in the bedroom dresser and under the bed where defendant and his girlfriend were sleeping, when officers arrived to execute a search warrant. In light of the close proximity of both defendant and his girlfriend to the seized items and the other circumstances of the arrest, a reasonable factfinder could draw an inference that the narcotics belonged to one of them.

¶ 58    At the jury trial, defendant testified, and his girlfriend did not, and the jury found him guilty of possession of a controlled substance with intent to deliver, but not guilty on both counts of unlawful possession of a weapon by a felon.

¶ 59    In support of defendant's *pro se* petition, the girlfriend avers that defendant was "only an overnight guest and never lived at the residence." In view of the suspicion that this affidavit thrusts on her, this averment took courage to make, and a reasonably prudent person would not typically make such an averment unless it was true.

¶ 60    The majority discounts the value of her statement since she was his girlfriend (*supra* ¶ 33) but I respectfully disagree due to the gravity of the statement that she is making. There were only two people sleeping in the center of a bedroom loaded with narcotics-trafficking paraphernalia.

She has sworn that defendant was merely an overnight guest. She has stated that she is willing to testify, which includes subjecting herself to cross-examination concerning her own presence in the bedroom and her own knowledge of the drugs and paraphernalia in the room she apparently inhabited. *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 19 ("Generally, habitation of the location where contraband is found is sufficient evidence of control constituting constructive possession."); *People v. McCurrine*, 2019 IL App (1st) 160817, ¶ 29 ("control was shown," in part, by the fact "that the residence was admittedly his"). This is not an idle statement by some distant bystander or a codefendant already charged and in jail. The record establishes that she is employed as a medical assistant at Northwestern University. As a result, her affidavit is not " 'a fanciful factual allegation.' " *People v. Bokins*, 2017 IL 121365, ¶ 9 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009)).

¶ 61     The majority also find that defendant's trial counsel "undoubtedly" knew what the girlfriend would testify to, if called as a witness. *Supra* ¶ 32. The majority explains that it is making this assumption based on one pretrial exchange:

> "During pretrial argument on the State's motion *in limine* to bar the defense from referencing 'any hearsay statements made by the defendant,' the State remarked that the motion related to '[the girlfriends's] testifying to statements the defendant made to bolster, you know, I don't lie, you know, or that's not my stuff.' In response, the court asked if [the girlfriend] was in the bedroom with defendant. Trial counsel replied that the court was correct and stated '*if* she heard that, I think she would be allowed to bring that up.' " (Emphasis added.) *Supra* ¶ 32.

The majority's next line is: "Based on the record, counsel *undoubtedly* knew what [the girlfriend] could provide as a witness." (Emphasis added.) *Supra* ¶ 32. However, the majority does not explain how it reasoned all the way from " 'if' " to "undoubtedly."

¶ 62    In her affidavit in support of defendant's *pro se* petition, the girlfriend states that she was at the trial, on a certain day, in order "to testify on his behalf," and that she "would have testified" that he was merely an "overnight guest" in the bedroom where both the narcotics and the two of them were found. Her willingness to testify is corroborated by trial counsel's statement on the record that she was waiting outside the courtroom during the defense's case. For the reasons already discussed, I would find that her averments are not frivolous and warrant further factual investigation.

¶ 63    Second, I am troubled by the State's broad representation about the officers' lack of misconduct. Before trial, the State filed a motion *in limine* to preclude the defense from mentioning, referencing or arguing police or prosecutorial misconduct that occurred in other cases. When the State's motion was heard on March 10, 2014, the prosecutor explained that he was seeking to bar the defense from "asking officers about other cases where they have been suspended or anything unrelated to the case." The court then asked:

> "THE COURT: Is there anything like that?
>
> PROSECUTOR: Not to the State's knowledge.
>
> THE COURT: That's going to be granted."

Above, the trial court posed a broad question, asking about "*anything* like that" and, in response, the prosecutor made a broad representation, "[n]ot to the *State's* knowledge." (Emphases added.) However, a short computer search by defendant appeared to raise questions about this answer. Attached to his petition were reports of: a $150,000 settlement against an "Officer Paul Park" and

other officers for falsely arresting and physically assaulting two men; a $75,000 settlement against several officers, including Officer Paul Parks, for breaking into a residence, illegally searching it and harassing its residents on four separate occasions; the filing of a federal civil rights action against Officer William Hronopoulos, another officer involved in this case; and a complaint against Officer Parks for false arrest. Defendant also submitted a printout from cpdb.co about a false arrest by Officer Parks. According to Github which hosts the site, CPDB stands for "The Citizens Police Data Project," and is "an interactive repository of formal complaints registered against Chicago police officers." Github, https://github.com/ inviinst/DPDB (last visited Mar. 11, 2020).

¶ 64    The majority treats the issue primarily as a question of whether the documents attached by defendant to his *pro se* petition would have been admissible at trial.

¶ 65    However, the issue raised by defendant is whether trial counsel's performance fell below a standard of reasonableness by not performing (as defendant claims) a cursory internet search as to why the State was moving to bar any reference to past prosecutorial or police misconduct, or whether the prosecutor committed a discovery violation by making a blanket representation about the "State's knowledge" that there was not "anything."

¶ 66    Since I would advance this petition to the next stage based on the girlfriend's averments, and an allegation of counsel ineffectiveness is judged on the basis of the entire record (*People v. Williams*, 2020 IL App (1st) 162312, ¶ 98), I would not limit counsel, who is yet to be appointed, in his or her consideration of defendant's claims and amendment of defendant's *pro se* petition.

¶ 67    For the foregoing reasons, I must respectfully dissent.